**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE BED BATH & BEYOND INC.
SECTION 16(b) LITIGATION

Case No. 1:22-cv-09327-DEH

This document relates to:

*Augenbaum v. RC Ventures LLC et al.*,
       Case No. 1:22-cv-09327-DEH

## PLAINTIFF AUGENBAUM'S MEMORANDUM OF LAW IN OPPOSITION TO RC VENTURES LLC AND RYAN COHEN'S MOTION TO DISMISS

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

Jeffrey S. Abraham
Michael J. Klein
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email: jabraham@aftlaw.com
         mklein@aftlaw.com

*Counsel for Plaintiff Todd Augenbaum*

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

SUMMARY OF RELEVANT FACTS ......................................................................... 2

ARGUMENT ............................................................................................................... 4

A.   SECTION 16(b) IS A STRICT LIABILITY STATUTE HAVING FOUR
     ELEMENTS, EACH OF WHICH IS SATISFIED BY PLAINTIFF'S
     COMPLAINT ..................................................................................................... 5

     1.   Plaintiff Properly Alleges that RCV Was a 10% Beneficial Owner of
          Common Stock at the Time of Some of Its Purchases............................ 5

          a.   Rule 13d-1(j) Does Not Apply to Computing Beneficial Ownership
               for Purposes of Section 16 ........................................................... 6

          b.   Even Assuming *Arguendo* That Rule 13d-1(j) Applies, Defendants
               Have Failed to Establish That They May Rely on Its Safe Harbor ........... 9

     2.   Defendants Do Not Dispute That Plaintiff Properly Alleges the Other
          Elements of Section 16(b)..................................................................... 12

B.   PLAINTIFF PROPERLY ALLEGES THAT RCV IS SUBJECT TO LIABILITY
     AS A DIRECTOR BY DEPUTIZATION ........................................................ 12

     1.   Plaintiff Plausibly Alleges that RC Ventures Acted as a Director by
          Deputizing the New Directors to Serve on the Board........................... 13

     2.   The Rule 16a-2(a) Exemption is at Odds with the Plain Language of Section
          16(b) Making the Exemption a Nullity ................................................ 16

C.   THE REMEDIAL PURPOSE OF §16(b) IS WELL-SERVED BY IMPOSING
     LIABILITY ON RCV IN THIS ACTION ....................................................... 19

D.   PLAINTIFF AUGNEBAUM HAS A FINANCIAL INTEREST IN THE
     OUTOME OF THIS CASE SUFFICIENT TO SUPPORT ARTICLE III
     STANDING ...................................................................................................... 21

CONCLUSION........................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Klawans*,
    267 F.2d 840 (2d Cir. 1959) ............................................................................. 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 4

*Bittner v. United States*,
    598 U.S. ___, 143 S. Ct. 713 (2023) ............................................................... 17

*Blau v. Lehman*,
    368 U.S. 403 (1962) .................................................................................... 13, 18

*C.R.A. Realty Corp. v. Enron Corp.*,
    842 F. Supp. 88 (S.D.N.Y. 1994) .................................................................. 8, 12

*Calenture, LLC v. Pulte*,
    No. 21 Civ. 402, 2022 WL 912947 (S.D.N.Y. Mar. 29, 2022) ............ 13, 14, 16

*Capitol Recs., LLC v. Vimeo, LLC*,
    826 F.3d 78 (2d Cir. 2016) .................................................................................. 9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ............................................................................................. 7

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984) ........................................................................................... 17

*Department of Homeland Security v. MacLean*,
    574 U.S. 383 (2015) ........................................................................................... 17

*Feder v. Frost*,
    220 F.3d 29 (2d Cir. 2000) ............................................................................. 5, 19

*Feder v. Martin Marietta Corp.*,
    406 F.2d 260 (2d Cir. 1969) ........................................................... 13, 16, 18, 19

*Gallardo v. Marstiller*,
    596 U. S. ___, 142 S. Ct. 1751 (2022) ............................................................. 17

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ................................................................................ 4

*Gollust v. Mendell*,
    501 U.S. 115 (1991) .................................................................................... 18, 19

*Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*,
    298 F.3d 136 (2d Cir. 2002)...........................................................................................8

*In re Luxottica Group S.p.A., Securities Litigation*,
    293 F. Supp. 2d 224 (E.D.N.Y. 2003) ...........................................................................10

*In re VimpelCom, Ltd.*,
    No. 1-15-cv-8672 (ALC), 2016 WL 5390902 (S.D.N.Y. Sept. 26, 2016) ........................4

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)...................................................................................................8

*Lewis v. Dekcraft Corp.*,
    No. 69 Civ. 2982, 1974 WL 418 (S.D.N.Y. June 27, 1974)...........................................14

*Magma Power Co. v. Dow Chem. Co.*,
    136 F.3d 316 (2d Cir. 1998)..........................................................................................20

*Mercer v. Gupta*,
    712 F.3d 756 (2d Cir. 2013)............................................................................................9

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    No. 18 CIV. 9848 (PGG), 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ........................5

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002)........................................................................................................17

*Reliance Elec. Co. v. Emerson Elec. Co.*,
    404 U.S. 418 (1972)................................................................................................18, 20

*Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*,
    No. 05 Civ. 10466 (RPP), 2006 WL 2129331 (S.D.N.Y. July 31, 2006), *aff'd*, 522 F.3d
    242 (2d Cir. 2008)..........................................................................................................16

*Rubenstein v. Very Hungry, LLC*,
    No. 14 Civ. 888, 2015 WL 1509761 (D. Colo. Mar. 30, 2015)......................................14

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)...........................................................................10

*Segen v. CDR-Cookie Acquisitions, L.L.C.*,
    No. 05 Civ. 3509 (RWS), 2006 WL 59550 (S.D.N.Y. Jan. 4, 2006) .................13, 14, 15

*Silverman v. Citibank, N.A.*,
    2023 WL 7305243 (S.D.N.Y. Nov. 6, 2023) ...................................................................4

*Smolowe v. Delendo Corp.*,
    136 F.2d 231 (2d Cir. 1943)..........................................................................................20

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)................................................................................ 9

*Strauss on Behalf of Servico, Inc. v. Am. Holdings, Inc.*,
    902 F. Supp. 475 (S.D.N.Y. 1995)........................................................................ 7

*United States v. Home Concrete & Supply, LLC*,
    566 U.S. 478 (2012).............................................................................................. 17

**Statutes, Rules, and Regulations**

15 U.S.C. §78b ............................................................................................................. 19

15 U.S.C. §78c(a)(7) ..................................................................................................... 13

15 U.S.C. §78l(b) .......................................................................................................... 2

15 U.S.C. §78p(a) ................................................................................................. 5, 6, 7, 8

15 U.S.C. §78p(b) .................................................................................................. *passim*

17 C.F.R. §240.13d-1(b)(1)(ii)(j).......................................................................... *passim*

17 C.F.R. §240.16a-1(a)(1) ........................................................................................... 9

17 C.F.R. §240.16a-1(a)(1)(x) ...................................................................................... 6

17 C.F.R. §240.16a-2 ........................................................................................... *passim*

17 C.F.R. §240.16a-2(c) ............................................................................................... 6

Fed. R. Civ. P. 12(b)(6)......................................................................................... 4, 9, 13

Fed. R. Evid. 201 .......................................................................................................... 4

*Interpretative Release on Rules Applicable to Insider Reporting and Trading*,
    Exchange Act Release No. 18114, 1981 WL 31301 (Sept. 24, 1981)............................. 19

*Ownership Reports and Trading by Officers, Directors and Principal Security Holders*,
    56 FR 7242 (1991) ................................................................................... 5, 6, 13

Securities Exchange Act Release No. 34-27148,
    44 SEC Docket 526 (Sept. 6, 1989) .................................................................. 19

**Other Authorities**

Arnold S. Jacobs, *The Williams Act—Tender Offers and Stock Accumulations*, §2:84 (2022
    Update)................................................................................................................. 9

Romeo and Dye, *Comprehensive Section 16 Outline* at 117 (Dec. 2004) ..................................... 19

S. Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L.J. 391 (1991) ............................................................................................. 20

SEC Division of Corporate Finance, Compliance and Disclosure Interpretations, Exchange Act Section 16 and Related Rules and Forms, Interp. 209.02 (May 23, 2007) ........................ 8

Plaintiff Todd Augenbaum ("Plaintiff"), by his undersigned attorneys, respectfully submits this memorandum of law in opposition to the motion to dismiss made by Defendants RC Ventures LLC ("RC Ventures" or "RCV") and Ryan Cohen ("Cohen" and, with RCV, "Defendants").

## INTRODUCTION

Plaintiff plausibly alleges all four elements of a claim seeking the disgorgement of short-swing insider trading profits earned by Defendants from trading in Bed Bath & Beyond Inc. ("BBBY" or the "Company") securities pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants' effort to obtain dismissal of Plaintiff's claims relating to RCV's trading while a more than 10% beneficial owner of BBBY common stock (the "Common Stock") fail because Defendants mistakenly rely on U.S. Securities and Exchange Commission ("SEC" or the "Commission") Rule 13d-1(j), which does not apply to Section 16(b) claims and, in any event, constitutes an affirmative defense that RCV is unable to prove on this motion to dismiss.

Similarly, Plaintiff plausibly alleges that RC Ventures functioned as a director through three (3) new members who joined the Company's board of directors (the "Board") at RCV's behest pursuant to the terms of a written agreement between RC Ventures and BBBY.  SEC Rule 16a-2(a), upon which Defendants rely in seeking an exemption from liability, is directly contrary to the plain language of Section 16(b) based upon binding precedent and, therefore, must be set aside as exceeding the scope of the SEC's statutory authority.

RCV being subject to liability in this action is consistent with the purpose of Section 16(b) given that RC Ventures profited handsomely by dumping its BBBY securities on August 16, 2022, shortly before BBBY disclosed news adversely causing the Common Stock's trading price to tumble.  Indeed, had RC Ventures not sold at that time and, instead, waited to hold the Common Stock for six months from its purchases, it would have suffered significant losses.

## SUMMARY OF RELEVANT FACTS

BBBY Common Stock, at the time this action was commenced, was publicly traded on The Nasdaq Capital Market ("NASDAQ") and registered with the SEC pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. §78l(b).  ¶4.[1]  Defendant RC Ventures is an investment vehicle for Ryan Cohen, a highly sophisticated investor.  *Id.* ¶3; Defs. Ex. 2 at Schedule A.

On January 6, 2022, BBBY filed a Form 10-Q with the SEC disclosing that the Company had 96,337,713 shares of Common Stock outstanding as of November 27, 2021.  *Id.* ¶11.  At that time, BBBY was one year into a well-publicized three-year program to repurchase Common Stock, and had disclosed, on November 2, 2021, that it was advancing that program by two years and expecting to repurchase $400 million of its Common Stock by the end of its 2021 fiscal year on February 26, 2022.  ¶7; *see also* Defs. Ex. 3 at 1.  On January 6, 2022, approximately half-way through that quarter, BBBY reiterated that it expected to repurchase $275 million of Common Stock during its fiscal fourth quarter ending February 26, 2022.  ¶8.

On January 13, 2022, RC Ventures began acquiring BBBY Common Stock and on March 7, 2022, RCV filed a Schedule 13D with the SEC disclosing that it beneficially owned 9,450,100 shares of Common Stock.  ¶¶11, 16; *see also* Defs. Ex. 1 at 5/8.  The Schedule 13D also stated that RC Ventures' ownership position amounted to 9.8% of the total shares of Common Stock outstanding based upon the 96,337,713 shares reported outstanding as of November 27, 2021.  *Id.*

In truth and in fact, by March 1, 2022, Defendants beneficially owned 10% or more of the Common Stock outstanding based upon the actual 81,979,000 shares outstanding on February 26, 2022.  ¶¶9, 12, 28.  After RCV owned 10% of the Common Stock, it purchased approximately

---

[1]   Citations to "¶___" are to allegations of the Augenbaum Complaint.

770,00 additional shares from March 1, 2022 through March 3, 2022 at prices ranging between $16.68 and $17.25 per Share.  ¶9.

On or about March 24, 2022, RC Ventures entered into a Cooperation Agreement with BBBY pursuant to which the Company increased the size of the Board from eleven to fourteen members and appointed Marjorie L. Bowen, Shelly C. Lombard and Benjamin Rosenzweig (collectively the "New Directors") as directors. ¶¶14 and 16; *see also* Defs. Ex. 2 (Cooperation Agreement) §1(a)(i)(B).  The Cooperation Agreement, among other things, gave RCV the right to appoint other directors to the Board if the New Directors were unwilling or unable to serve, provided that RCV continued to own the lesser of 3,900,000 shares of Common Stock or 4.04% of the Outstanding Common Stock.  Cooperation Agreement §1(a)(ii).

Less than six months later, on August 16 and August 17, 2022, RCV liquidated its position in BBBY Common Stock by selling over $178 million of Common Stock at prices ranging from $18.68 to $29.22 per share.  ¶¶23, 28.  Those sale prices far exceeded the prices paid by RCV less than six months earlier of as low as $13.43 per Share to acquire the Common Stock and call options.  ¶9.  Similarly, RCV liquidated its position in call options it had purchased less than six months earlier, also at a substantial profit.  ¶23.

The Common Stock's price began to tumble once RCV's sales were publicly disclosed on August 18, 2022, with the Common Stock closing the next day at $11.03 per share, down more than 40% from its previous closing price of $18.55 per share.  *See* Declaration of Jeffrey S.

Abraham ("Abraham Declaration")[2] Ex. A.[3]  Investors' fears about RCV's actions signaling bad news were confirmed when on August 31, 2022, BBBY announced a significant capital raise including an at-the-market offering of Common Stock (¶25) causing the trading price of Common Stock to tumble further to close at $9.53 per share.  *See* Abraham Decl. Ex. A.

On December 23, 2022, Benjamin Rosenzweig, one of the New Directors, resigned from the Board.  *See* Abraham Decl. Ex. B.  On February 11, 2023, Marjorie Bowen, another one of the New Directors, resigned from the Board. *See* Abraham Decl. Ex. C.  The only New Director remaining on the Board is Shelly C. Lombard.  *See id.*[4]

## ARGUMENT

Rule 12(b)(6) requires that a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court should not dismiss a complaint for failure to state a claim if the complaint's factual allegations "raise a right to relief above the speculative level[.]" *Id.* at 555.  The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g., Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 CIV. 9848 (PGG), 2020 WL 5757628, at

---

[2]     Abraham Declaration Exhibits A through G are attached to the March 24, 2023, Declaration of Jeffrey S. Abraham (ECF No. 47).  Abraham Declaration Exhibits H *et seq.* are attached to the Declaration of Jeffrey S. Abraham filed contemporaneously with this memorandum.

[3]     Stock market trading prices, which can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, are subject to judicial notice. *See, e.g.*, Fed. R. Evid. 201(b)(2); *In re VimpelCom, Ltd.*, No. 1-15-cv-8672 (ALC), 2016 WL 5390902, at *3 (S.D.N.Y. Sept. 26, 2016) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)).

[4]     This Court may also take judicial notice of filings made in other courts. *See, e.g.*, *Silverman v. Citibank, N.A.*, 2023 WL 7305243, at *6 (S.D.N.Y. Nov. 6, 2023).

*5 (S.D.N.Y. Sept. 27, 2020) (citations omitted).  Here, Plaintiff has more than adequately satisfied

this standard.

## A.     SECTION 16(b) IS A STRICT LIABILITY STATUTE HAVING FOUR ELEMENTS, EACH OF WHICH IS SATISFIED BY PLAINTIFF'S COMPLAINT

There are four elements to a §16(b) claim: "(1) a purchase and (2) a sale of securities (3)

by an officer or director of the issuer or by a shareholder who owns more than ten percent of any

one class of the issuer's securities (4) within a six-month period."  *Feder v. Frost*, 220 F.3d 29, 32

(2d Cir. 2000) (citations omitted).   "No showing of actual misuse of inside information or of

unlawful intent is necessary to compel disgorgement."  *Id.* (citations omitted).

While Section 16(b) does "not … cover any transaction where such [10%] beneficial owner

was not such both at the time of the purchase and sale, or the sale and purchase, of the security[,]"

no such statutory limitation on liability exists requiring directors or officers to be statutory insiders

at the time of both their purchases and sales to trigger Section 16(b) liability.  15 U.S.C. §78p(b).

However, in 1991 the SEC adopted a rule purporting to exempt from Section 16(b) transactions

occurring before a director was appointed to a board unless the earlier transaction occurred "as a

result of the issuer registering a class of equity securities pursuant to section 12 of the Act."  17

C.F.R. §240.16a-2; *see also Ownership Reports and Trading by Officers, Directors and Principal

Security Holders*, 56 FR 7242, 7244 (1991) (the "1991 Adopting Release").

### 1.     Plaintiff Properly Alleges that RCV Was a 10% Beneficial Owner of Common Stock at the Time of Some of Its Purchases

Defendants do not, nor could they reasonably, dispute that they became 10% beneficial

owners of the Common Stock by March 1, 2022.  ¶¶11-12.  Instead, Defendants contend that they

are exempt from Section 16(b) liability based upon the safe harbor afforded by SEC Rule 13d-1(j),

17 C.F.R. §240.13d-1(j).  Defendants are in error because: (a) Rule 13d-1(j) does not apply to

§16(a) reporting requirements or the liability imposed by §16(b) and, instead, only serves as a safe

harbor with respect to the reporting requirements relating to §13(d) of the Exchange Act; (b) even if Rule 13d-1(j) applied to Section 16(b) claims – which it does not – it would still constitute an affirmative defense that cannot support dismissal on this motion.

> **a.      Rule 13d-1(j) Does Not Apply to Computing Beneficial Ownership for Purposes of Section 16**

Rule 16a-1(a)(1), 17 C.F.R. §240.16a-1(a)(1), governs reporting of beneficial ownership of Section 16(a) of the Exchange Act, 15 U.S.C. §78p(a), providing that a person "is deemed a beneficial owner pursuant to section 13(d) of the [Exchange] Act and the rules thereunder."  17 C.F.R. §240.16a-1(a)(i).  However, as Plaintiff Augenbaum previously explained, Rule 16a-1(a)(1) only imports the "section 13(d) analysis, such as the exclusion of non-voting securities and counting only those derivative securities exercisable or convertible within 60 days … into the ten percent holder determination for section 16 purposes."  1991 Adopting Release, 56 FR at 7244 (quoted at ECF No. 46 at p.6).  Accordingly, neither Rule 16a-1(a)(1) nor the 1991 Adopting Release makes any mention of importing Section 13(d)'s safe harbor for *reporting* beneficial ownership into calculating beneficial ownership for purposes of §16(b).

Instead, Rule 16a-2, 17 C.F.R. §240.16a-2, governs and provides that: "[a]ny person who is the beneficial owner, directly or indirectly, of more than ten percent of any class of equity securities … registered pursuant to section 12 of the [Exchange] Act … shall be subject to the provisions of section 16 of the Act."  17 C.F.R. §240.16a-2.  As Plaintiff Augenbaum previously explained, Rule 16a-2's failure to cross-reference Rule 13d-1(j) cannot be viewed as accidental given that Rule 16a-2 specifically provides exemptions for certain other transactions relating to ten percent beneficial ownership (*see* 17 C.F.R. §240.16a-2(c)) and Rule 16a-1(a)(1) cross referencing §13(d) rules.  *See*, *e.g.*, 17 C.F.R. §240.16a-1(a)(1)(x) (cross-referencing 17 C.F.R. §240.13d-1(b)(1)(ii)(j)) (cited at ECF No. 46 at pp.6-7).

Similarly, as Plaintiff Augenbaum previously explained, Rule 13d-1(j) only mentions "section 13(d) and 13(g)" while making no reference to either §16(a) reporting or §16(b) liability. 17 C.F.R. §240.13d-1(j).  Had the SEC intended for that rule to also apply to Section 16(a) reporting and Section 16(b) liability, it could easily have provided for such in the language of the rule or at least not consciously limited the rule's application to Sections 13(d) and 13(g).  *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994) (no claiming for aiding and abetting a violation of §10(b) of the Exchange Act exists because "[w]hen Congress wished to provide a remedy … it had little trouble doing so expressly.")

*Strauss on Behalf of Servico, Inc. v. Am. Holdings, Inc.*, 902 F. Supp. 475 (S.D.N.Y. 1995), is instructive on this point.  In *Strauss,* the parties disagreed as to whether the issuer's statement concerning the number of shares outstanding in a quarterly report filed on Form 10-Q or an annual report filed on Form 10-K with the SEC governed the number of shares to be used in computing whether the defendant was a 10% or more beneficial owner of the issuer's outstanding common stock.  The court held that it was "not aware of any statute or regulation making any of these figures conclusive for Section 16 purposes."  *Id*. at 476.  In so holding, Judge Kaplan cited as a "compare" 17 C.F.R. §240.13d–1(e), which is the predecessor regulation identical in form to current Rule 13d-1(j), further evidencing that the rule does not apply to Section 16(b) actions.

Defendants cleverly contend in a footnote that "[t]he plain language of the regulation directly contradicts *Plaintiff Cohen's unsupported assertion*" that Rule 13d-1(j) does not apply to Section 16(b).  ECF No. 65 at 17 n.6 (emphasis added).  It may be true that Plaintiff Cohen's assertion was previously unsupported but Plaintiff Augenbaum's assertion, as discussed above, is and always has been very well supported.  Instead, Defendants willfully ignore Plaintiff

Augenbaum's analysis of the relevant regulatory language demonstrating that they have no meritorious response to those arguments.

*C.R.A. Realty Corp. v. Enron Corp.*, 842 F. Supp. 88, 91 (S.D.N.Y. 1994), the sole case Defendants rely upon, applied Rule 13d-1(e), the predecessor of Rule 13d-1(j), to a Section 16(b) action.  However, that decision is neither controlling nor persuasive because the plaintiff assumed that Rule 13d-1(j) applied to §16(a) reporting requirements and §16(b) liability without examining the actual language of Rule 13d-1(j) or comparing the rule to the relevant language of either Rule 16a-1(a)(1) or Rule 16a-2.  The language of the relevant rules, as discussed above, demonstrate that Rule 13d-1(j), in fact, does not apply to cases of Section 16(b) liability and then-Judge Mukasey was deprived of that argument in making his decision.

SEC Division of Corporate Finance, Compliance and Disclosure Interpretations, Exchange Act Section 16 and Related Rules and Forms, Interp. 209.02 (May 23, 2007), upon which Defendants rely, does not interpret or discuss how Rule 16a-2 and 13d-1(j) should be interpreted. Instead, it simply explains that if a person was not previously aware that they were a 10% beneficial owner, they should promptly make the required §16(a) filings.

However, even assuming *arguendo* that Interp. 209.02 sought to address the issue, the SEC has cautioned that the Compliance and Disclosure Interpretations "reflect the views of the staff of the Division of Corporation Finance. ***They are not rules, regulations, or statements of the Commission. The Commission has neither approved nor disapproved these interpretations***." https://www.sec.gov/divisions/corpfin/cfguidance (emphasis added).  As such, Interp. 209.02 is "entitled to no deference beyond whatever persuasive value [it] might have."  *Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 145 (2d Cir. 2002) (discussing SEC No-Action Letters) (citations omitted).

   **b.**  **Even Assuming *Arguendo* That Rule 13d-1(j) Applies, Defendants Have Failed to Establish That They May Rely on Its Safe Harbor**

Since Rule 13d-1(j) constitutes a safe harbor, in the litigation context it constitutes an affirmative defense. *See, e.g.*, *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016) (the Digital Millennium Copyright Act of 1998's "safe harbor is properly seen as an affirmative defense, and therefore must be raised by the defendant."); *Mercer v. Gupta*, 712 F.3d 756, 759 (2d Cir. 2013) (Exchange Act Rule 16a-1 safe harbor is an affirmative defense). As such, it is RC Ventures' burden to establish that it satisfied the safe harbor by lacking constructive knowledge of the relevant facts. *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion [only] if the defense appears on the face of the complaint."); *see also* Jacobs, *The Williams Act—Tender Offers and Stock Accumulations*, §2:84 at text accompanying n.48 ("Courts should impose the burden of proving" the existence of the affirmative defense on Defendants.). Defendants cannot do so on this motion to dismiss.

Thus, Defendants contend that Rule 13d-1(j) applies to exempt their March 2022 purchases from Section 16(b) because they did not have constructive knowledge that RCV was a 10% beneficial owner of the Common Stock. *See* Defs. Memo. at 18-21. Defendants, however, misconstrue the scope of Rule 13d-1(j)'s safe harbor because, by its terms, it only applies if RCV lacked constructive knowledge that BBBY's prior reporting of the number of shares of Common Stock outstanding was no longer accurate. 17 C.F.R. §240.13d-1(j).

This is a standard which Defendants cannot satisfy on this motion because the "reason to believe" or constructive knowledge standard "impute[s] to the reporting person knowledge of publicly available data." *See* Arnold S. Jacobs, *The Williams Act—Tender Offers and Stock Accumulations*, §2:84 at nn.42-48 & accompanying text (2022 Update) (citing *SEC v. Fiore*, 416

9

F. Supp. 3d 306, 329-30 (S.D.N.Y. 2019); *In re Luxottica Group S.p.A., Securities Litigation*, 293 F. Supp. 2d 224, 235 (E.D.N.Y. 2003)).  Here, Plaintiff plausibly alleges RCV's constructive knowledge based upon BBBY publicly stating on November 2, 2021, that it expected to repurchase $400 million of its Common Stock by the end of its fiscal year 2021 on February 26, 2022, (¶7) and then publicly reaffirming on January 6, 2022, that it still intended to repurchase $275 million in Common Stock during the then-current fiscal quarter.  *Id.* ¶8.[5]

Defendants seek to flip the script by contending that RC Ventures "could not know the exact timing and amount of BBBY's share repurchases when RCV bought BBBY securities in February and March 2022."  Defs. Memo. at 20-21.  That argument, however, is inherently flawed because the exception invalidating the Rule 13d-1(j) safe harbor does not require precise knowledge of either the dates and amounts of shares repurchased or the number of shares outstanding but, instead, only that RCV had "reason to know that the information contained in therein [*i.e.,* in the last SEC filing]is inaccurate."  17 C.F.R. §240.13d-1(j).

Here, Plaintiff has alleged facts at least raising a reasonable doubt – if not factually establishing – that Defendants had precisely such a reason to doubt the total share count as of November 27, 2021 contained in the January 6, 2022 Form 10-Q because BBBY had twice publicly disclosed a large repurchase was in progress and should end in or around late February 2022.  *See* ¶¶7-8.  Indeed, Defendants' knowledge of the Company's share repurchases is also demonstrated by Defendant Cohen, in his March 6, 2022 correspondence to the Board specifically referencing the share repurchase program.  *See,* Abraham Decl. Ex. H.[6]

---

[5]     These allegations are taken from Form 8-K Current Reports filed by BBBY.  *See* Abraham Declaration Ex. E.

[6]     This is particularly true since Defendants purchased 9,450,100 shares of Common Stock with the Company previously reporting 96,337,713 shares of Common Stock outstanding.  Simple

Defendants seek to avoid these facts by referencing a provision in the Cooperation Agreement stating that Defendants owned "approximately 9.8% of the Common Stock issued and outstanding" on the date thereof. Defs. Mem. at 19 (omitting the word approximately). However, that contract provision does not address the issue of whether Defendants had "reason to know" whether the prior published share count was inaccurate as provided for in Rule 13d-1(j). Nor were Defendants free to stipulate to the facts whether they had "reason to know" or to independently provide themselves with a rump safe harbor from Section 16(b) liability.

Nor does it matter as Defendants seek to contend that BBBY expressed the scale of its repurchases in dollars and not a number of shares. This is particularly true since BBBY publicly disclosed that it planned to finish its repurchase program during that quarter, publicly stating on November 2, 2021, that it expected to repurchase $400 million of its Common Stock by February 26, 2022, and then publicly reaffirming on January 6, 2022, that it still intended to repurchase $275 million in Common Stock during the then-current fiscal quarter. ¶¶7-8. Because Defendants knew the prices at which they were repurchasing and the amount BBBY intended to spend, they should have known *approximately* how many shares the Company would repurchase.[7] Therefore, common sense dictated that there existed a substantial likelihood that Defendants had, in fact, crossed the 10% ownership threshold. *See* n.6, *supra*.

---

math demonstrates that if the Company repurchased only 1,836,713 shares of Common Stock (96,337,713-94,501,000), Defendants would have passed the 10% threshold for being considered statutory insiders subject to Section 16(b).

[7]     Portions of BBBY's Form 10-K that Defendants do not submit show that the Company's average repurchase price for its 14,364,600 shares of Common Stock was $16.04 per share (Abraham Decl. Ex. I), or about a 4.5% difference from Defendants' average purchase price of $15.344 per share for 7.78 million (*see* ECF No. 66-1 at 5/13), which is unsurprising given the large amount of contemporaneous purchases made by Defendants and the Company.

Defendants seek to avoid the implication of those known and publicly disclosed facts by contending that calculating the impact of the Company's repurchase program would assume completion on time.  Defs. Memo. at 20-21.  However, Defendants have not shown any reason to believe that BBBY was not following through on its publicly stated plan.  Nor does it matter on this motion because Defendants' conjecture is not sufficient to establish that they lacked a "reason to believe" that the share count was no longer accurate.

*C.R.A. Realty Corp. v. Enron Corp.*, *supra*, upon which Defendants rely, is inapposite to the case at Bar because it involved preferred stock that was convertible at different holder's option, which could not be predicted. *Id.* at 89.  Here, in contrast, there was no unpredictable third party implicated by any of Plaintiff Augenbaum's allegations.  Instead, BBBY's share repurchase program was publicly disclosed and known to Defendants particularly given the March 6, 2022 letter mentioning the share repurchase program.  *See* Ex. H.

**2.  Defendants Do Not Dispute That Plaintiff Properly Alleges the Other Elements of Section 16(b)**

Defendants do not, and cannot reasonably, challenge that they sold securities within a six-month period and were 10% holders at the time of some of their sales.  Their arguments for dismissal fall if they made any purchases while being subject to liability as a beneficial owner of 10% of the outstanding Common Stock.

**B.  PLAINTIFF PROPERLY ALLEGES THAT RCV IS SUBJECT TO LIABILITY AS A DIRECTOR BY DEPUTIZATION**

Defendants contend that: (i) Plaintiff has not properly alleged that RCV acted as a director of BBBY; and (ii) even if RCV's status as a director has been properly alleged, its transactions in the Company's securities are exempt from liability pursuant to SEC Rule 16a-2(a), 17 C.F.R. §240.16a-2(a).  Defendants are in error on both points.

12

1. **Plaintiff Plausibly Alleges that RC Ventures Acted as a Director by Deputizing the New Directors to Serve on the Board**

Directors are one of the classes of persons subject to Section 16(b) liability.  *See* 15 U.S.C. §78p(b).  The Exchange Act defines "director" to mean "any director of a corporation or any person performing similar functions with respect to any organization."  15 U.S.C. §78c(a)(7).  The Supreme Court, in analyzing the statutory language, held that a person need not formally be titled as a "director" to be liable under Section 16(b) but instead, could also "function through a deputy."  *Blau v. Lehman,* 368 U.S. 403, 409-10 (1962).

The Supreme Court in *Blau* gave little guidance on how to spot a director by deputization but opined that the necessary relationship existed where a director had been deputized to perform a director's duties not for himself but for the entity at issue.  *Id.* at 410.  As a result, "deputization is a question of fact to be settled case by case and not a conclusion of law[.]'"  *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969) (quoted in *Calenture, LLC v. Pulte*, No. 21 Civ. 402, 2022 WL 912947, at *3 (S.D.N.Y. Mar. 29, 2022) (denying motion to dismiss §16(b) claims based upon a theory of deputization)); *see also* 1991 Adopting Release, 56 FR 7242, 7244 & n.27 (leaving development of deputization doctrine to case law).

Here, RC Ventures owned a significant portion of the outstanding Common Stock, and in connection with that investment obtained the power, which RCV exercised, to appoint directors to the Board (¶¶14-15).  *Segen v. CDR-Cookie Acquisitions, L.L.C.*, No. 05 Civ. 3509 (RWS), 2006 WL 59550 (S.D.N.Y. Jan. 4, 2006) – a case Plaintiff Augenbaum previously cited (ECF No. 46 at 11-12) and which Defendants continue to ignore – is on point in holding that those facts at least plausibly allege that an investor deputized directors to represent its interests on a board of directors. Specifically, in *Segen*, the late Judge Sweet held that deputization was sufficiently alleged where the defendants, in connection with their investment, obtained the power to appoint three directors

to the company's board which the defendants then exercised to, in fact, appoint three directors.  *Id.* at *7 (citing *Lewis v. Dekcraft Corp.*, No. 69 Civ. 2982, 1974 WL 418, at *3 (S.D.N.Y. June 27, 1974) (deputization was established based on the undisputed facts that the deputizing company had acquired 36% of the issuer, thereby gaining control, and pursuant to that transaction gained and exercised the right to appoint four members to the issuer's board)).

*Rubenstein v. Very Hungry, LLC*, No. 14 Civ. 888, 2015 WL 1509761 (D. Colo. Mar. 30, 2015), is the only case Plaintiff is familiar with in which a complaint alleging a deputization theory has been dismissed on a Rule 12(b)(6) motion.  *Rubenstein*, however, is inapposite to the case at Bar because there the plaintiff pleaded himself out of court by "alleg[ing] facts indicating that Mr. Schatz was not, indeed, deputized and that his actions were contrary to those of a 'deputy.'"  *Id.* at *2.  Also, unlike the case at Bar, the defendant in *Rubenstein* "did not have a contractual right to appoint a director to the … Board, and in [SEC filings] expressly stated that it had no intention to seek board representation…."  *Id.* at *4.

Defendants seek to avoid the plausible inference of deputization created by RCV securing Board positions for the New Directors by contending that the New Directors were described as "independent" in the Company's proxy statement.  *See* Defs. Memo. at 22.  However, independence for purposes of BBBY's proxy statement refers only to "***relationships and transactions between a director or their immediate family and the Company or members of executive management***."  ECF No. 46 at 12.  Independence in the context of the proxy statement does ***not*** relate to the relationship the New Directors had with RCV, which is the relevant issue for determining whether deputization exists.

Defendants contend that RCV could not have been a director by deputization because the Complaint does not satisfy a five-factor test which Judge Castel referred to in *Calenture*.  *See* Defs.

14

Memo. at 22-23.  That multi-part test, however, is better suited to a summary judgment motion rather than the Rule 12(b)(6) motion to dismiss being decided by this Court and, in any event, Plaintiff has properly alleged facts sufficient to satisfy those five factors, as demonstrated in the following analysis:

       **i.**      **Whether the shareholding entity recommended the director for election or appointment to the board**.  RCV secured Board spots for the New Directors.  ¶14; *see also* Cooperation Agreement §1(a).  This factor is the end of the necessary analysis on a Rule 12(b)(6) motion.  *See Segen v. CDR-Cookie Acquisitions, L.L.C.*, *supra*.

       **ii.**     **Whether the shareholding entity recommended the director for the purpose of protecting or representing the entity's interests rather than for the purpose of guiding or enhancing the issuer's business activities.**  This is an issue of fact to be resolved through discovery.  Nonetheless, Plaintiff notes that RCV was agitating for BBBY to spin off the buybuy BABY business (*see, e.g.*, ECF No. 43-1 at p.11/13) and at least two of the New Directors were to be placed on the Strategy Committee for a "review of a strategic analysis of the buybuy BABY business."  Cooperation Agreement §1(b).  Plaintiff also notes, in consideration of appointing the New Directors to the Board, BBBY agreed to various standstill provisions preventing it from unseating the incumbent directors and management.  *See* Cooperation Agreement §2(a).  Finally, two of the New Directors, Marjorie Bowen and Benjamin Rosenzweig, resigned from the Board within months of RC Ventures selling out its interest in BBBY (*see* p. 4, *supra*; *see also* Abraham Declaration Exs B-D) further evidencing that they were placed on the Board to protect RC Ventures' interests.

      **iii.**     **Whether the director regularly gained access to material nonpublic information about the issuer**.  RCV specifically retained for itself the right to "communicat[e]

privately with the Board."  Cooperation Agreement §2(c).  A similar provision has been held by Judge Castel to factually support the claim that a director was deputized to represent the interests of an entity placing him on the board of directors.  *See Calenture*, 2022 WL 912947, at *5.

       **iv.**      **Whether the director shared the confidential information with the shareholding entity**.  Defendants can be considered a director by deputization even if the New Directors did not share confidential information with RCV.  *See, e.g.*, *Feder*, 406 F.2d at 264.  However, such a sharing of confidential information, if demonstrated, would conclusively establish that RCV was a director by deputization.  *See, e.g.*, *Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*, No. 05 Civ. 10466 (RPP), 2006 WL 2129331, at *9-10 (S.D.N.Y. July 31, 2006), *aff'd*, 522 F.3d 242 (2d Cir. 2008).  Here, as discussed above with respect to factor (ii), the Cooperation Agreement envisioned a sharing of confidential information with RCV.

       **v.**      **Whether the shareholding entity used the information to inform its investment strategy regarding the issuer's securities**.  The analysis for this factor is the same as for the fourth factor.  Plaintiff, however, notes that the timing of RCV's sales of BBBY Securities starting on August 16, 2022 is certainly suspicious in light of the Company's August 31, 2022 announcement that it would be conducting an at-the-market offering of Common Stock. ¶25.  That suspicion is further heightened by the fact that, as discussed above, Defendants would have escaped Section 16(b) liability by holding their BBBY securities for six months after the dates of purchase, *i.e.*, not engaging in short-swing trading.

    **2.**    **The Rule 16a-2(a) Exemption is at Odds with the Plain Language of Section 16(b) Making the Exemption a Nullity**

Congress allocated to the Commission the power to exempt from Section 16(b) liability any transaction "not comprehended within the purpose of this subsection."  15 U.S.C. §78p(b).  In 1991, the SEC adopted Rule 16a-2(a), 17 C.F.R. §240.16a-2(a), exempting from §16(b) liability

transactions such as those in this case occurring before the time a person became a director of a corporate issuer.  Rule 16a-2(a) seeks to overrule the Second Circuit's decision in *Adler v. Klawans*, 267 F.2d 840 (2d Cir. 1959), holding that a director is liable for short-swing profits under Section 16(b) if he was a director at the time of the sale even if at the time of the matching transaction less than six months earlier he was not yet a director.

The SEC's statutory authority with respect to §16(b) is limited to exempting "any transaction or transactions which the Commission by rules and regulations may exempt as ***not comprehended within the purpose of this subsection***."  15 U.S.C. §78p(b) (emphasis added).  Therefore, to be a valid exercise of the SEC's authority, Rule 16a-2(a) must only exempt transactions not within the statutory purpose of Section 16(b) based upon its "unambiguous [meaning] using 'traditional tools of statutory construction.'"  Defs. Memo. at 22 (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984)); *see also United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488 (2012) ("[i]f a court, *employing traditional tools of statutory construction*, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.") (emphasis in original) (quoting *Chevron*, 467 U.S. at 843 n. 9); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. at 86.

Here, Congress' intention and purpose with respect to the §16(b) liability of directors can be determined using such traditional rules of statutory interpretation by applying the "*expressio unius est exclusio alterius*" cannon of statutory interpretation.  *Adler*, 267 F.2d at 847; *see also* Defs. Memo. at 21.  *Expressio unius est exclusio alterius* constitutes exactly such a traditional tool of statutory interpretation.  *See, e.g.*, *Bittner v. United States*, 598 U.S. ___, 143 S. Ct. 713 (2023) (citing *Department of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015); *Gallardo v. Marstiller*, 596 U. S. ___, 142 S. Ct. 1751, 1758-60 (2022)).  Congress, therefore, clearly expressed

its intention to hold corporate directors liable for short swing trading pellucidly in only requiring that they be a director on either the date of the purchase or sale. *Adler v. Klawans, supra*; *Feder v. Martin Marietta*, 406 F.2d at 268. In other words, Rule 16a-2(a) is directly contrary to the statute and, therefore, invalid.[8]

Nonetheless, Defendants contend that Rule 16a-2(a) represents a valid exercise of the SEC's rulemaking authority because the Second Circuit in *Adler* held open the possibility that the SEC could exempt such transactions in the future. *See* Defs. Memo. at 26-27. That argument lacks merit because the Second Circuit subsequently closed the door on the very same argument that *Adler* arguably left open by subsequently setting aside an SEC rule providing an exemption from §16(b) liability to a person who was not a director at both the time of the purchase and sale by explaining that:

> To be sure, the congressional belief that inside information could be abused, the belief that prompted the prophylactic enactment of § 16(b), is just as germane to the situation when a person is a director only at the time of purchase as when he is a director only at the time of sale. For, in the case of a director who resigns his directorship before the sale it is possible for both the purchase and sale to have been unfairly motivated by insider knowledge; whereas if the purchase were made prior to the directorship only the sale could be motivated by inside information. Clearly, therefore, a 'short swing' sale or purchase by a resigning director must be a transaction 'comprehended within the purpose of' § 16(a), and ***to the extent Rule X-16A-10 exempts such a transaction from § 16(b) the Rule is invalid***.

---

[8]      Plaintiff notes that the Supreme Court has repeatedly refused to afford deference to the SEC's views with respect to its proffered interpretations of §16(b). *See, e.g., Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (rejecting SEC view with respect to the requirements for standing in a §16(b) action)*; Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 426-27 (1972) (rejecting SEC views with respect to when a person became a 10% beneficial owner subject to §16(b)); *Blau*, 368 U.S. at 413 (rejecting the Commission's views with respect to expanding Section 16(b) liability to cover partnerships of which a director is a member).

*Feder v. Martin Marietta*, 406 F.2d at 268. (emphasis added).[9]  The same result applies here because, as is the case with former SEC Rule X-16A-10, current SEC Rule 16a-2(a), sought to exempt transactions by directors where they were not beneficial owners both at the time of the purchase and sale.

Plaintiff made this precise argument in opposing Defendants' prior motion to dismiss.  *See* ECF No. 46 at p. 16.  Nonetheless, Defendants ignore Plaintiff's argument demonstrating that they have no meritorious response to the clear holding of *Martin Marietta.*

## C. THE REMEDIAL PURPOSE OF §16(b) IS WELL-SERVED BY IMPOSING LIABILITY ON RCV IN THIS ACTION

Congress adopted Section 16(b) based upon evidence that "insiders actually manipulated the market price of their stock by causing a corporation to follow financial policies calculated to produce sudden changes in market prices in order to obtain short swing profits." *Interpretative Release on Rules Applicable to Insider Reporting and Trading*, Exchange Act Release No. 18114, 1981 WL 31301, at *1 (Sept. 24, 1981).  "Prohibiting short-swing trading by insiders with nonpublic information was an important part of Congress' plan in the [Exchange] Act to 'insure the maintenance of fair and honest markets' and to eliminate such trading."  *Gollust*, 501 U.S. at 121 (quoting 15 U.S.C. §78b, citation omitted).

Congress believed that it would be difficult, if not impossible, to prove such actual speculative abuse by insiders, so "the only method Congress deemed effective to curb the evils of insider trading … a flat rule taking the profits out of a class of transactions in which the possibility

---

[9]    The SEC's rationale for providing a broader exemption is that the director might not have known that he (or she or it) would be subject to §16(b) liability at the time of the first transaction. *See* Defs. Memo. at 24 (quoting Securities Exchange Act Release No. 34-27148, 44 SEC Docket 526, §III.a.2 (Sept. 6, 1989)).  However, that rationale is a weak one given that §16(b) is a strict liability statute.  *See, e.g.*, *Feder v. Frost, supra.*  Moreover, an investor such as RCV "may assure its non-liability under Section 16(b) by simply not engaging in short-swing transactions." Romeo and Dye, *Comprehensive Section 16 Outline* at 117 (Dec. 2004).

of abuse was believed to be intolerably great." *Reliance Elec.*, 404 U.S. at 422; *see also* S. Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L.J. 391, 433 & n.141 (1991).  Accordingly, "Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998) (citing *Smolowe v. Delendo Corp.*, 136 F.2d 231, 235-36 (2d Cir. 1943) (quoting Rep. Corcoran, chief spokesman for the drafters and proponents of Section 16(b))).

Even though actual abuse of inside information is not an element of the claim, RCV's trading in BBBY securities implicates the concerns Congress expressed in enacting §16(b).  BBBY is, or at least was during the relevant period, the precise type of small capitalization stock for which retail investors' trading activity is unrelated to fundamental value but, instead, trades based upon social media discourse.  *See, e.g.*, Abraham Declaration, Ex. G at 119.  Such stocks are often referred to as "meme stocks" and, indeed, BBBY Common Stock even has its own group on Reddit, a popular social media platform.  *See* https://www.reddit.com/r/BBBY/;  Abraham Declaration Ex. G.  In the case of BBBY, the meme excitement centered on Cohen, the principal and managing member of RCV, having taken a large stake in BBBY.  *See, e.g.*, ¶¶13, 20.

RCV leveraged BBBY being a meme stock to its profitable advantage by filing a Schedule 13D amendment with the SEC on August 16, 2022, disclosing that it beneficially owned 11.8% of the outstanding shares of Common Stock, a change from its prior disclosure of purportedly beneficially owning only 9.8% of the outstanding shares of Common Stock.  *Compare* ¶11 *with* ¶21.  The new disclosure acknowledged facts which already existed on March 7, 2022 and had been otherwise disclosed in a preliminary proxy statement filed with the SEC on June 1, 2022 (*id.*

¶16(b)) – more than two months earlier – and, therefore, unquestionably known to RCV as a sophisticated investor having Board representation.

BBBY shares reacted as one would expect a meme stock to react – by surging in price and volume of shares traded.  ¶21.  RC Ventures took advantage of this price surge, dumping millions of shares at inflated prices. ¶23.  It was only after RCV successfully sold its shares at inflated prices to unsophisticated investors that RC Ventures disclosed that it was no longer a 10% beneficial owner of the Common Stock.  ¶23.  Then almost on cue, two weeks later, BBBY disclosed its plan to raise capital (¶25) which plausibly motivated RCV's rush to sell the BBBY securities it had purchased only months earlier.

Moreover, applying Section 16(b) liability in the manner directed by the statute also does not create any unfair surprise.  Specifically, RCV knew at the time it sold BBBY securities in August that it was a more than 10% beneficial owner at that time (¶21) and knew or had a strong reason to believe that it had been a 10% or more beneficial owner of the Common Stock since March 1, 2022, based on the Company's April 21, 2022, Form 10-K stating that, as of March 26, 2022, BBBY had 79,845,789 outstanding shares of Common Stock.  *See* ECF No. 43-4 at 2.  RC Ventures, therefore, could easily have avoided potential Section 16(b) liability by just waiting an additional two weeks – until after BBBY disclosed its financing plans, including its planned at-the-market offering of Common Stock – before selling its shares of Common Stock.

**D.**   **PLAINTIFF AUGNEBAUM HAS A FINANCIAL INTEREST IN THE OUTOME OF THIS CASE SUFFICIENT TO SUPPORT ARTICLE III STANDING**

One key fact relevant to Defendants' Rule 12(b)(1) motion is that Sixth Street Specialty Lending, Inc. ("Sixth Street") is a mere creditor of the Company.  *See* Defs. Memo. at 13-14. Another relevant fact is that Plaintiff Augenbaum is a shareholder of Sixth Street.  *See* Declaration of Todd Augenbaum (as Abraham Declaration Ex. J).  These facts alone act to defeat Defendants'

contention that the cancellation of BBBY Common Stock deprived Plaintiff Augenbaum of standing to pursue the Section 16(b) claims asserted in this action.

*Gollust v. Mendell,* 501 U.S. 115 (1991), the controlling Supreme Court case addressing Section 16(b) standing, held that "[t]he terms of § 16(b), read in context … provide standing of *signal breadth,* expressly *limited only by conditions existing at the time an action is begun*." (emphasis added). After the commencement of the action, the plaintiff is only required to have "some continuing financial stake in the litigation" because "Congress clearly intended to put 'a private-profit motive" in the prosecution of Section 16(b) actions and meet the standing requirements of Article III of the U.S. Constitution. *Id*. at 124-25. However, *Gollust* took a very broad view of the financial interests that could satisfy the requisite financial interest, holding that owning even a share of stock or debt issued by the parent company of the entity which would benefit from the litigation is sufficient. *Id.* at 127.

Here, BBBY's bankruptcy court filings disclose that the Company's debt is owned by Sixth Street which is defined as the ABL Agent, DIP Agent, and FILO Agent. ECF No. 58-1. That entity is a publicly traded company, and trades under the ticker symbol "TSLX" on the New York Stock Exchange. Plaintiff Augenbaum owns stock in TSLX, constituting a sufficient interest in the outcome of this litigation, thereby satisfying the standing requirements of Section 16(b), because he owns equity in the entity that owns debt, and thus he owns a portion of that debt.

In response to this argument, which Plaintiff has previously articulated to this Court (*see* ECF No. 59), Defendants contend that "[t]he Supreme Court did not hold that a plaintiff maintains a continuing financial interest after its stock holdings in the issuer are cancelled by *separately* purchasing stock in a different entity." Defs. Memo. at 13. That is technically correct because the Supreme Court was not called upon to address that issue and, indeed, they did not hold to that

purchasing stock in a separate entity was insufficient to maintain standing.  Instead, the Supreme Court did, in fact, hold that owning even a share of stock or debt issued by the parent company of the entity which would benefit from the litigation is sufficient.  *Gollust,* 501 U.S. at 127. Defendants do not even attempt to explain why Plaintiff owning stock in TSLX is insufficient to satisfy that standard.

*In re Worldcom Inc.*, 351 B.R. 130 (Bankr. S.D.N.Y. 2006), upon which Defendants rely (Defs. Memo. at 13-14) is not on point.  Instead, *Worldcom* only addressed the issue of standing to pursue a shareholder derivative claim after a corporate merger under both Georgia and Delaware law.  Accordingly, *Worldcom* does not seek to address the scope of standing in a §16(b) action and, indeed, does not even mention the Supreme Court's controlling decision in *Gollust*.

The continuing financial interest standard is also satisfied by Plaintiff being free to seek a modest fee upon the successful outcome of this action.  *Cf.* 15 U.S.C. §78u-4(a)(4); *see also Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 259 (2d Cir. 2021) (recognizing "it may be that [the plaintiff] retained some economic interest after trial and judgment in terms of … a potential incentive award for his service as class representative" but the argument was waived); *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012) ("the prospect of [an incentive award], though probabilistic rather than certain, suffices to confer standing" for a federal claim). Defendants are correct that §78u-4(a)(4) does not apply to this §16(b) action (*see* Defs. Memo. at 14) but that does not preclude Plaintiff from applying to this Court for an incentive fee and, indeed, such incentive fees are often awarded in representative actions.  *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 390 (1970) (clarifying that § 16(b) cases are "cases of th[e] type" that implicate the common benefit doctrine).  Even if he were not entitled to an incentive award, Plaintiff's loss of the value of BBBY Common Stock, which he held through cancellation to create a common

fund, should be a reimbursable expense from any judgment or settlement obtained, which also gives Plaintiff a continuing financial interest in this Action.

## CONCLUSION

Therefore, for all the reasons set forth above and in Plaintiff's prior submissions, Defendants' motion to dismiss should be denied in its entirety.

Dated: November 22, 2023            By:  /s/  Jeffrey S. Abraham          
                                     Jeffrey S. Abraham
                                     Michael J. Klein
                                     **ABRAHAM, FRUCHTER & TWERSKY, LLP**
                                     450 7th Avenue, 38th Floor
                                     New York, New York 10123
                                     Telephone: (212) 279-5050
                                     Email: jabraham@aftlaw.com
                                               mklein@aftlaw.com